## HENRY W. KING & COMPANY
### v.
### SANDIE BROWN.

*Sales—Fraudulent Representations in Purchase of Goods—Subsequent Sale by Purchaser to Father—Rescission—Replevin—Evidence—Instructions.*

1. To warrant the rescission of a sale the vendor must show actual fraud, consisting in a positive intention of the vendee, at the time of the purchase, not to pay, or in false representations as to his ability to pay.

2. Known insolvency is not sufficient proof of an intention not to pay for goods purchased.

3. In an action of replevin to recover goods sold to the son of the defendant prior to the transfer, by the son to the father, of the stock of goods in payment of a large indebtedness, it is *held:* That the evidence sustains the verdict for the defendant; that it does not appear that the defendant had knowledge of any fraudulent or false representations made to the plaintiffs by his son; that knowledge that his son was in embarrassed circumstances would not put him on inquiry as to whether he had committed fraud; and that there is no substantial error in giving and refusing instructions.

[Opinion filed January 14, 1887.]

In connection with this case see the related case of Brown v. Bierman, *ante*, p 574.

APPEAL from the Circuit Court of Sangamon County; the Hon. JAMES A. CREIGHTON, Judge, presiding.

Messrs. BRADLEY & BRADLEY and W. D. CARPENTER, for appellants.

Messrs. ALLEN, BROWN & BROWN, for appellee.

PLEASANTS, P. J. In the winter of 1881–2, Charles R. Brown, who had previously resided at St. Louis with his father, the appellee, came to Springfield and engaged as clerk in the old established clothing and tailoring house of his cousin William S. Hunter. After a few months of such service he bought a half interest in the business for $10,000, of which his father advanced for him the sum of $9,000, taking his note therefor, payable one day after date with interest at eight per cent. About a year thereafter Hunter sold his remaining interest to P. P. O'Donnell, and in February, 1884, Brown bought out O'Donnell for $6,188, being sixty-eight per cent. of the invoice price. He paid down $1,000, and for the residue gave his two notes indorsed by his father and uncle.

Appellee was then and for many years had been in business with Jaccard & Company, a large jewelry house in St. Louis. He was here a few times while his son was carrying on this business, and the latter visited the family at St. Louis monthly or oftener, arriving late on Saturday evening and returning early Monday morning. From the little conversation between them on that subject upon these occasions, from Charles' expressed desire to change his location, and from his own general observation when here, appellee got the impression that the situation was not altogether satisfactory, but he had no particular or definite knowledge of it, nor made any special inquiry respecting it. Only the first year's interest on his note for $9,000 had been paid. He knew, in a general way, that Charles was owing some debts to other parties for goods,

and in the latter part of the summer or fall of 1884, became apprehensive that he would not be able to "pull through." About the first of November he learned from O'Donnell that the note to him for $3,188 was wholly unpaid, though past due, and was pressed for payment. The other, for $2,000, was in bank and about to become due. Thereupon he consulted counsel, came to Springfield, and after further legal advice taken here, bought the entire concern in satisfaction of his own claim and the indebtedness to O'Donnell, which he then assumed and afterward paid. His claim, thus increased, amounted to about $17,000. The goods invoiced at about $21,000, but the uncontradicted testimony is that they were not worth more than 50 cents on the dollar, and less was realized on them by appellee. The notes and accounts, together amounting to something like $3,000, were worthless. Charles had paid for his spring purchases. Those made for the fall were received in August and September, on four months' time, and aggregated from $2,500 to $3,000. Among them was a bill of clothing of $866, bought of appellants, on representations by him respecting his financial condition which they claim were false and fraudulent.

On the 4th of November, the bill of sale to his father was executed and the stock delivered. It was put in charge of Mr. Culver, who had been a salesman under Charles, but he employed new help and proceeded to dispose of it according to directions of appellee.

Appellants then brought this suit in replevin for the goods so bought of them. The verdict was for the defendant, finding the property to be in him, and awarding 1 cent damages. A motion for a new trial was overruled, and judgment entered on the verdict, from which the plaintiffs took this appeal.

The foregoing facts, with the representations by means of which Charles R. Brown obtained the goods in controversy, show the whole case made for plaintiffs. It presented two questions of fact: first, were these representations fraudulent on the part of Charles; and second, was defendant chargeable with notice of this fraud when he purchased of him.

To entitle plaintiffs to recover, they were required to estab-

lish the affirmative on both by a preponderance of evidence. Authorities can hardly be necessary, but with special reference to the second, we cite the following: Gavagan v. Bryant, 83 Ill. 376; Schweizer v. Tracy, 76 Ill. 345; Miller v. Kirby, 74 Ill. 242; Kranert v. Simon, 65 Ill. 344; Hessing v. McCloskey, 37 Ill. 341, 352; Catlin v. Warren, 16 Ill. App. 418; Axtell v. Cullen, 3 Ill. App. 527; Storey v. Agnew, 2 Ill. App. 353.

Conceding, then, for all present purposes, that this was done as to the first, we would not feel at liberty to disturb the finding against them on the second, even if it were based on their own evidence alone. But there was very c]ear, positive and uncontradicted testimony on the part of defendant that he had in fact no knowledge or information whatever of any representation made by Charles to plaintiffs or to any other party of whom be bought, or that he had bought of them or either of them, nor of any fact or circumstance to excite a suspicion that he had made any fraudulent or false representations to anybody; and upon all the evidence, under any instructions that could have been properly given, a finding that he purchased *bona fide*, for value and without notice of any fraud upon plaintiffs, ought to stand.

The jury were instructed, as asked by plaintiffs, to the effect that if Charles obtained credit of them for these goods with a preconceived intention not to pay for them, or by means of fraudulent representations respecting his financial condition, they would have the right to rescind the sale as against him, and if defendant participated in the fraud, to recover in this action, and that fraud might be shown by circumstances. Those given for the defendant went still further in favor of plaintiffs, and made his right to hold the goods depend upon proof that his purchase of Charles was made "in good faith, and for a valuable consideration, and without notice of said false representations."

But appellant's principal point is that the court refused to give also the three following: 1. That if they believe from the evidence in this case that the defendant Sandie Brown, previous to the time of the purchase of the stock of goods from Charles R. Brown, knew that Charles R. Brown was in

difficulty of a financial character, and allowed Charles R. Brown to continue in business and purchase new goods of King & Company, whether Sandie Brown knew all the facts or not, if the jury believe from the evidence that he knew enough regarding the financial condition of Charles R. Brown to put him upon inquiry, or to excite the suspicions of a prudent man, then, in purchasing said stock of goods of Charles R. Brown to cancel a pre-existing debt, he could receive no better title to said goods than Charles R. Brown had against the claim of King & Company.

2.   Tells the jury that upon the same hypothesis stated in the first, the defendant " made himself a party to the fraud," if any there was.

3.   That if from all the evidence in the case you believe that Charles R. Brown purchased the goods from the plaintiffs upon representations of his financial worth and standing, and such representations were false, and that plaintiffs relied upon them as true and extended to said Brown a credit for such goods, relying upon such representations as true, then no title passed by such purchase in such goods to said Brown from the plaintiffs.

This last one, applying only to the title as between plaintiffs and Charles R. Brown, would be quite useless, unless it were the law that if Charles acquired no title the defendant could acquire none through him, and was, therefore, very liable to mislead the jury to that conclusion.   The proposition contained in it is clearly set forth, in its proper connection and with all its legitimate bearing upon the real issue in several of those given.   We think the others were also rightly refused, as inapplicable, misleading and substantially unsound. There is no evidence in the record bringing home to the defendant the knowledge of any particular act or declaration of Charles, or of any particular fact relating to his "difficulty," that would tend to show he had misrepresented his condition.   He had known from the first that Charles started in business upon a capital almost wholly borrowed, and then knew that he had not reduced that debt, and that he owed some others for goods purchased to replenish his stock; but to

whom, how much, or upon what representation, if any, he had contracted these debts for goods, or that they amounted, in the aggregate, to any considerable sum, it appears he did not know. True, the hypothesis of these instructions is "if he knew enough regarding the financial condition of Charles R. Brown to put him upon inquiry or to excite the suspicions of a prudent man;" but that above stated is all there was to constitute "enough." And how prudent a man? Suspicious of what? Inquiry in regard to what? In Hanchett v. Kimbark, 118 Ill. 132, the Supreme Court say a "reasonably prudent person" and "inquiry in regard to the fraud," but the refused instructions do not. Appellee's knowledge may have been quite enough to excite his fear that his son would not be able to " pull through," and put him upon inquiry as to that, and yet have been no ground for a suspicion that he had committed any fraud. If Charles himself, with all his own knowledge of his own condition, had not falsely represented it nor indicated an intention not to pay, otherwise than by such knowledge, it could hardly be claimed that appellants could have rescinded the sale even as to him. The reason is that such a condition is not incompatible with an honest intention to pay, and to warrant a rescission of the sale the vendor must show actual fraud consisting in a positive intention of the vendee, at the time of the purchase, not to pay (of which known insolvency is not sufficient proof—Catlin v. Warren, *supra*), or in false representation of his ability to pay. How, then, can the possession of more limited knowledge of his condition as one of financial difficulty, without other indication of such fraud on the part of Charles, be held sufficient to charge appellee with participation in whatever fraud there was and avoid his title as purchaser from Charles?' See Axtell v. Cullen, 3 Ill. App. 527. Yet these instructions in effect, as applied to this case, require no more. They import that there is such a natural connection or relation between them as cause and effect, that the obtaining of credit for goods by a merchant who is in difficulty of a financial character would of itself alone suggest that he had fraudulently misrepresented his condition. We are not willing to affirm this proposition as sound in law or

fact. In the Hanchett case the subsequent purchasers knew much more. They had themselves charged their vendor with fraud. All that appellants here had the right to ask on this point was given, as we have seen, in other instructions. We perceive no material error in this record.

*Judgment affirmed.*